UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                                    :
UNITED STATES OF AMERICA,        :    CASE NO. 4:14-CR-00426-1
                                                    :
        Plaintiff,                          :
                                                    :
vs.                                               :    OPINION & ORDER
                                                    :    [Resolving Docs. 126, 129, 146]
VINCENT D. MOORER,                  :
                                                    :
        Defendant.                         :
                                                    :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

The government charges Defendant Vincent Moorer with conspiracy to distribute heroin.[1] Moorer has filed three suppression motions. On April 7, 2015, the Court held a hearing on Moorer's motions.

For the reasons below, the Court **DENIES** Moorer's motion to suppress evidence obtained through Title III wiretaps. The Court also **DENIES** Moorer's motion to suppress evidence found and a statement made during an October 12, 2014, traffic stop. Finally, the Court **GRANTS** Moorer's motion to suppress the statement given after his November 4, 2014, arrest.

**I. Background**

Between June and November 2014, the government was investigating heroin trafficking in Youngstown and Akron, Ohio. The government sought and received authorization for wiretaps on seven different telephone lines labeled TT1 through TT7. Moorer himself used lines TT6 and TT7, though his conversations were recorded on earlier intercepts because he made calls to individuals

---

[1] Doc. 9. Moorer is also charged with possession with intent to distribute heroin, use of a telephone to facilitate drug trafficking, conspiracy to engage in money laundering, being a felon in possession of a firearm, and possessing a firearm during a drug trafficking offense. *Id*.

-1-

Case No. 4:14-CR-00426-1
Gwin, J.

already subject to wiretap surveillance.

The first two wiretaps, authorized on June 16, 2014, were for two phone numbers used by Andre Duncan (TT1 and TT2). At this stage of the investigation, the government aimed "to determine the identities of the cocaine and heroin supplier(s) of Andre L. Duncan."[2]

On July 25, 2014, relying in part on communications intercepted under the first wiretap order, the government obtained authorization to wiretap two additional numbers, one again belonging to Andre Duncan (TT4), the other to Morris Perry (TT3). By this point the government believed that Defendant Moorer was Duncan's supplier,[3] and sought, among other things, information on "the unknown heroin suppliers of Andre L. Duncan, Morris D. Perry, Melvin E. Johnson Jr. and Vincent D. Moorer."[4]

On August 8, 2014, the government obtained court authorization to wiretap a phone number used by Melvin Johnson (TT5).[5] On September 2, 2014, the government obtained authorization to wiretap a phone number used by Defendant Moorer (TT6).[6] On September 26, 2014, the government obtained authorization to wiretap another number used by Defendant Moorer (TT7).[7]

From its investigation, the government believed Moorer led a conspiracy to transport heroin from Atlanta, Georgia and distribute it in Youngstown, Ohio. On October 12, 2014, the government believed Moorer would be leaving the Youngstown area with the proceeds of drug sales. DEA asked the Ohio State Highway Patrol ("OSHP") to find and stop a vehicle Moorer was known to use.

---

[2] Gov't Ex. 1 at 30.
[3] Gov't Ex. 2 at 18.
[4] *Id.* at 48 (emphasis omitted).
[5] Gov't Ex. 3.
[6] Gov't Ex. 4.
[7] Gov't Ex. 5.

Case No. 4:14-CR-00426-1
Gwin, J.

Around 10:30 AM that day, OSHP Trooper Eric Golias encountered the vehicle. Dashboard camera footage shows Golias following the vehicle for approximately ninety seconds.[8] With directions to find any reason to stop the vehicle, Golias stopped the car for following too closely and for excessive tint on the driver's side window. After approaching the car, Golias smelled unburnt marijuana and found that the driver had a suspended license. Vincent Moorer was sitting in the front passenger's seat. Golias searched the vehicle and found burnt marijuana, marijuana stems, and a bag in the trunk containing jewelry and $20,000 in cash.[9] Defendant Moorer admitted the cash and jewelry were his.

The vehicle was subsequently taken to a nearby OSHP garage where the vehicle and passengers were photographed and the vehicle was taken apart to examine any body cavities that might house narcotics. The additional search did not reveal any drugs in the car's compartments or moldings. The passengers were not arrested and were released four and a half hours after the traffic stop began. The DEA, however, took possession of Moorer's jewelry and money.[10]

Moorer retained criminal defense attorney James Lanzo to recover the money and jewelry. Defendant Moorer and defense attorney Lanzo called the DEA as part of this effort. On November 4, 2014, the DEA told Moorer to come to its Youngstown office to retrieve the jewelry that had been seized. After arriving at the DEA office to pick up his jewelry, Moorer was arrested. Officer Wells testified that the return of the jewelry was a ruse to arrest Moorer without incident.[11]

Upon arrest, Moorer was handcuffed and brought to an interview room. Wells started a

---

[8] Gov't Ex. 28A.
[9] Gov't Exs. 11-20.
[10] Hr'g Tr. at 39-73.
[11] *Id*. at 13-16.

-3-

Case No. 4:14-CR-00426-1
Gwin, J.

videotaped interview, reading Moorer his *Miranda* rights.

Beginning the interview, Wells gave a lengthy preamble, telling Moorer that he was in a "unique position" to help himself and to help Moorer's family by speaking to DEA. After giving Moorer this encouragement to speak, Wells asked Moorer if he wanted to answer questions. Twice, Moorer clearly shook his head no.

Nonetheless, Wells continued speaking with Moorer, telling him that search warrants were being executed at Moorer's homes. Wells told Moorer that Moorer's new house was "not your house anymore." Even though Moorer had exercised his right not to give any statement, Agent Samuel Mosca then asked Moorer three times if co-defendant Melvin Johnson was at home. Moorer repeatedly shrugged. Mosca next told Moorer, "[Y]ou're not alone in this. You know. You're not alone. Matter of fact there are some very special people nearby, that are tied up in this too. So think about it. You ain't just helping yourself out."[12]

Moorer was next taken to a holding cell. With Moorer in the holding cell, Officer Musca positioned himself in the hallway outside the holding cell and began an animated conversation with other officers. Moorer testified that the law enforcement officers began saying that Moorer's girlfriend would soon be arrested and that Moorer's children would be taken into foster care. Moorer, who himself grew up in foster homes, began crying. Some twenty minutes after initially refusing to answer questions, Moorer knocked on the door of the holding cell, and asked the agents, "What do you want to know?"[13]

Wells resumed a video interview of Moorer. No *Miranda* waiver was read or signed at the

---

[12] Gov't Ex. 6.
[13] Hr'g Tr. at 91-93.

-4-

Case No. 4:14-CR-00426-1
Gwin, J.

second interview. Moorer proceeded to give a lengthy statement.[14]

## II. Legal Standards

**A. Wiretaps**

Title III requires that the government obtain a warrant before intercepting wire or certain other communications.[15] To obtain such a warrant, the government must comply with certain procedural requirements and make certain substantive showings. Relevant to this case, the government must both demonstrate probable cause[16] and make "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[17] This latter requirement is commonly known as the "necessity requirement."

"[T]he purpose of the necessity requirement 'is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.'"[18] The requirement also serves to prevent the government from using wiretaps as a first step or where "traditional investigative techniques would suffice to expose the crime."[19] "In endeavoring to secure a wiretap warrant, the government need not prove the impossibility of other means of obtaining information. Instead, the necessity provisions merely require that law enforcement officials give

---

[14] Gov't Ex. 6.
[15] *See* 18 U.S.C. §§ 2511, 2516.
[16] *See id.* § 2518(3).
[17] *Id.* § 2518(1)(c).
[18] *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977)).
[19] *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007) (internal quotation marks and citations omitted).

Case No. 4:14-CR-00426-1
Gwin, J.

serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate."[20]

Both trial courts and appellate courts generally "accord great deference to the determinations of the issuing judge."[21] "'[T]he fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant.'"[22]

Wiretaps obtained in violation of Title III are generally subject to suppression, and the *Leon* good faith exception does not apply.[23]

**B. Traffic Stop**

"[S]topping an automobile and detaining its occupants constitute[s] a 'seizure' within the meaning of th[e] [Fourth] Amendment[], even though the purpose of the stop is limited and the resulting detention quite brief."[24] An automobile stop is reasonable where the police have probable cause to believe that a traffic violation has occurred[25] or where the police have reasonable articulable suspicion of criminal activity.[26] When the police perform a lawful traffic stop, they are entitled to request that both the driver and any passengers exit the car.[27]

---

[20] *United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002) (internal quotation marks and citation omitted).
[21] *Rice*, 478 F.3d at 709 (quoting *Corrado*, 227 F.3d at 539).
[22] *Corrado*, 227 F.3d at 539 (quoting *United States v. Alfano*, 838 F.2d 158, 162 (6th Cir. 1988)).
[23] *Rice*, 478 F.3d at 711-14.
[24] *Delaware v. Prouse*, 440 U.S. 648, 653 (1979) (internal citation omitted).
[25] *See id.* at 659, 661, 663.
[26] *See United States v. Arvizu*, 534 U.S. 266, 275-77 (2002).
[27] *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013) (driver) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (per curiam)); *Maryland v. Wilson*, 519 U.S. 408 (1997) (passengers).

Case No. 4:14-CR-00426-1
Gwin, J.

"The Fourth Amendment allows police to detain a suspect on reasonable suspicion only for as long as it takes for the police to test the validity of their suspicions. Reasonable suspicion, a limited exception to the probable-cause requirement, does not permit unlimited bites at the apple. Officers must act to confirm or dispel their suspicions quickly."[28]

**C. Statement After Arrest**

*Miranda* warnings must be given to suspects before they are subject to custodial interrogation.[29] "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."[30] An individual must unambiguously invoke his right to remain silent.[31] But once he has done so, his request must be "scrupulously honored."[32]

"The term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."[33]

### III. Analysis

**A. Wiretaps**

Moorer cursorily challenged the probable cause element both in his motion and at the suppression hearing, but presented little specific argument.[34] The Court observes that the showing

---

[28] *United States v. Davis*, 430 F.3d 345, 357 (6th Cir. 2005).
[29] *Miranda v. Arizona*, 384 U.S. 436, 473 (1966).
[30] *Id*. at 473-74.
[31] *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010).
[32] *Miranda*, 384 U.S. at 479.
[33] *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).
[34] *See, e.g.*, Doc. 146 at 17-18; Hr'g Tr. at 131.

Case No. 4:14-CR-00426-1
Gwin, J.

may not have been as strong as the government believes,[35] but nonetheless concludes that each of the affidavits meets the probable cause standard.

Defendant Moorer's second and more serious challenge to the affidavits relates to the necessity requirement. Moorer argues that the government essentially used no other investigative techniques, instead impermissibly relying on the wiretap as the first step in its investigation.[36] This is a significant overstatement. Each of the affidavits contains dozens of pages detailing the activity connected to the investigation, which included, at various points, techniques such as confidential sources, controlled buys, physical surveillance, pen registers, and other electronic surveillance.

Moreover, each of the affidavits provided case-specific reasons why these and other techniques would not be adequate. For example, the government's fifth affidavit considered attempts to use witness interviews, but concluded that several potential targets were unlikely to disclose useful information and that they would likely reveal the questions the government asked to targets of the investigation.[37] Although the affidavits also include generic reasons why certain techniques are unlikely to succeed, the presence of case-specific information makes them sufficient.

Finally, Defendant Moorer advances two arguments that focus particularly on the government's first affidavit. First, Moorer notes that only six weeks into its investigation, the government applied for wiretaps. Moorer argues that this relatively brief period of time precludes a finding that the wiretaps were necessary.[38] But Moorer cites no authority, and the Court is aware of none, requiring an investigation to proceed for a certain period of time before the government

---

[35] *See* Hr'g Tr. at 131-39 (questioning the basis for the government's "interpretation" of some intercepted communications).
[36] *See, e.g.*, Hr'g Tr. at 125 ("They didn't do anything.").
[37] Gov't Ex. 5 at 38-41.
[38] Hr'g Tr. at 119.

Case No. 4:14-CR-00426-1
Gwin, J.

seeks authorization to conduct wiretaps.

Second, Defendant Moorer argues that because the first affidavit targeted Andre Duncan despite the fact that the government had already executed four controlled buys with Duncan, the wiretap was not necessary. Duncan, however, was not the sole, or even the primary, target of the investigation. Rather, as the government explained in the affidavit, the wiretap was designed to find information about Duncan's suppliers.[39] This broader scope is not impermissible.[40] The government needed to tap Duncan's phones to pursue its broader investigative goals, not to further incriminate Duncan.

Accordingly, the Court **DENIES** Moorer's motion to suppress the wiretap evidence.

**B. Traffic Stop**

Trooper Golias' stop of the vehicle was constitutional, as it was based on probable cause that two traffic violations had occurred. The stop quickly revealed that the driver had a suspended license and that the vehicle smelled of marijuana. Golias' initial investigative steps, such as removing the passengers from the vehicle, asking them questions, and performing an initial search of the vehicle were reasonable extensions of the stop. Shortly after initiating the search, Golias found Moorer's money and jewelry in the trunk.

But this stop soon became a four-hour long search of the car that revealed nothing. DEA and OSHP, based on a generalized suspicion that a large quantity of drugs must be somewhere in the car, unnecessarily extended the stop. "While [officers] may be disappointed when their chosen

---

[39] Gov't Ex. 1 at 30.

[40] *See* 1 James G. Carr & Patricia L. Bellia, The Law of Electronic Surveillance § 4.39 ("In evaluating the showing of necessity, a court may properly look to the government's overall investigation of a target organization, and not just to the investigatory steps taken with regard to the potential interceptees." (citing *United States v. Rivera*, 527 F.3d 891, 900 (9th Cir. 2008))).

Case No. 4:14-CR-00426-1
Gwin, J.

investigatory technique dispels their suspicions, the Fourth Amendment does not permit them to keep trying until they obtain the desired results."[41]

Nevertheless, the conclusion that the stop was unreasonably extended is of little consequence. Because the extension of the stop revealed nothing, there is no evidence to suppress. The actual evidence recovered – jewelry, cash, and a statement – were properly found as part of a stop based on probable cause of a traffic violation and reasonable suspicion of criminal activity.

The Court thus **DENIES** the motion to suppress the evidence found through the traffic stop.

**C. Statement After Arrest**

Undoubtedly, Moorer was subjected to custodial interrogation after his arrest at the DEA office. Equally clear is that Moorer unambiguously invoked his right to remain silent: asked twice, on video, whether he would answer questions, Moorer shook his head "no."

Instead of scrupulously honoring Moorer's request, DEA agents continued to ask Moorer questions and to make statements in front of him that were deliberately calculated to elicit an incriminating response. The video recording of the interview makes this undeniably clear.

Perhaps most troubling is an alleged exchange that did not occur on video. Moorer himself provided credible testimony that several officers, within earshot of Moorer, spoke about the imminent arrest of his girlfriend and the placement of his children in foster care. Interrogation, within the meaning of *Miranda*, thus continued well beyond Moorer's invocation of his right to remain silent.

The government makes a weak argument that intervening time and Moorer's initiation of the second conversation constitutes a voluntary waiver of *Miranda* rights. But in the twenty minutes

---

[41]*Davis*, 430. F.3d at 357.

Case No. 4:14-CR-00426-1
Gwin, J.

following his invocation of the right to remain silent, Moorer was subject to repeated interrogation. The government did not scrupulously honor Moorer's decision to remain silent.[42]

Accordingly, the Court **GRANTS** Moorer's motion to suppress the statement.

### IV. Conclusion

For the above reasons, the Court **DENIES** Moorer's motion to suppress evidence obtained through Title III wiretaps and the October 12, 2014, traffic stop. However, the Court **GRANTS** Moorer's motion to suppress the statement given after his November 4, 2014, arrest.

IT IS SO ORDERED.

Dated: April 8, 2015            s/ *James S. Gwin*
                                JAMES S. GWIN
                                UNITED STATES DISTRICT JUDGE

---

[42] *See Michigan v. Mosley*, 423 U.S. 96, 105-06 (1975) (noting that the right to remain silent is violated "where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind").